JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| OUR CLEAN WATERS, a non-profit corporation,<br><br>       Plaintiff,<br><br>       v.<br><br>Aircraft X-Ray Laboratories, Inc., a California corporation,<br><br>       Defendant. | Case No.: CV 17-8500-DMG (RAOx)<br>**CONSENT DECREE [11]** |

     This Consent Decree ("Consent Decree") is entered into between Our Clean Waters ("OCW") and Aircraft X-Ray Laboratories, Inc. ("AXL") (all parties collectively are referred to as the "SETTLING PARTIES") with respect to the following facts and objectives:

## <u>RECITALS</u>

     **WHEREAS**, OCW is a 501(c)(3) non-profit, public benefit corporation organized under the laws of the State of California, dedicated to working with communities to improve the social and natural environment.

     **WHEREAS**, AXL owns and operates a facility located at 5216 Pacific Blvd, Huntington Park, CA 90255 (the "Facility"). Through June 30, 2015, the Facility has operated pursuant to State Water Resources Control Board Water Quality Order No. 97-

03-DWQ, National Pollutant Discharge Elimination System General Permit No. CAS000001, Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities. Beginning on July 1, 2015, the Facility has operated pursuant to State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination System General Permit No. CAS000001 (hereinafter "General Permit"). A map of the Facility is attached hereto as Exhibit A and incorporated by reference;

**WHEREAS**, on or about July 24, 2017, OCW provided AXL with a Notice of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal Water Pollution Control Act (the "Act" or "Clean Water Act"), 33 U.S.C. § 1365;

**WHEREAS**, OCW filed its Complaint in the United States District Court for the Central District of California (Our Clean Waters v. Aircraft X-RAY Laboratories, Inc., a California corporation Case No. 2:17-cv-08500, on November 21, 2017;

**WHEREAS**, AXL denies any and all of OCW's claims in its 60-Day Notice Letter and Complaint;

**WHEREAS**, OCW and AXL, through their authorized representatives and without either adjudication of OCW's claims or admission by AXL of any alleged violation or other wrongdoing, have chosen to resolve in full OCW's allegations in the 60-Day Notice Letter and Complaint through settlement and avoid the cost and uncertainties of further litigation; and

**WHEREAS**, OCW and AXL have agreed that it is in their mutual interest to enter into this Consent Decree setting forth the terms and conditions appropriate to resolving OCW's allegations set forth in the 60-Day Notice Letter and Complaint.

**NOW, THEREFORE**, IT IS HEREBY STIPULATED BETWEEN THE SETTLING PARTIES AND IS HEREBY ORDERED AND DECREED BY THIS COURT AS FOLLOWS:

1. **Jurisdiction.** This Court has jurisdiction over the subject matter of this

action pursuant to Section 505(a) of the Clean Water Act, 33 U.S.C. §135(a);

2.    **Venue.**  Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Clean Water Act, 33 U.S.C. §1365(c)(1) because the AXL facility is located within this District;

3.    **Effective Date.**  The term "Effective Date," as used in this Consent Decree, shall mean the date that this Consent Decree is approved by the Court.

4.    **Termination Date.**  The term "Termination Date" as used in this Consent Decree, shall mean June 30, 2019.

5.    **Stipulation to Dismiss and [Proposed] Order.**  Within ten (10) calendar days of the Court executing this Agreement, OCW shall file a Stipulation to Dismiss thereon pursuant to Federal Rule of Civil Procedure 41(a)(2) with the United States District Court for the Central District of California ("District Court"), with this Consent Decree attached and incorporated by reference, specifying that OCW is dismissing with prejudice all claims in OCW's Complaint.

## COMMITMENTS OF AXL

6.    **Compliance with General Permit.**  AXL agrees to operate the Facility in compliance with the applicable requirements of the General Permit and the Clean Water Act.

7.    **Implemented Storm Water Controls.**  AXL shall maintain in good working order all storm water collection systems at the Facility currently installed or to be installed pursuant to this Consent Decree, including but not limited to, existing housekeeping measures.

8.    **Additional Structural Best Management Practices.**  By the Effective Date, AXL shall implement the following structural best management practices ("BMPs") to improve the storm water pollution prevention measures at the Facility:

(a)    Assure that the sections of the Facility identified on Exhibit A, exclusive of indentified landscaped areas, have been paved with asphalt in a sufficient manner to allow for the cleaning of the surface;

(b)     Assure that all forklifts maintained by the company at the Facility have, to the extent reasonably practical and available, low-zinc tires (i.e. tires with less than 2.1% zinc) as represented by the tire dealer or manufacturer of the tires;

(c)     Maintain at least 12 each, 4" x 72" weighted zeolite (or comparable material) wattles at the facility and distribute them in the flow paths of storm water run-off prior to oncoming storms.

9.     **Confirmation of New Structural BMPs.**  Within 30 days of the Effective Date, AXL shall confirm to OCW the installation of the measures described above in Paragraph 8.

10.     **Monitoring of Storm Water Discharges**.  AXL shall collect and analyze storm water discharges from the Facility in accordance with the General Permit and this Consent Decree for, at a minimum, pH, total suspended solids, oil and grease, nitrate + nitrite as nitrogen, and zinc.

11.     **Monitoring Results.**  Results from the Facility's sampling and analysis during the term of this Consent Decree shall be uploaded to the State Water Resources Control Board's ("State Board") Storm Water Multiple Application and Report Tracking System ("SMARTS") in accordance with the requirements of the General Permit.

12.     **Additional Measures.**  If the Facility's storm water sampling results during the 2017-2018 and/or 2018-2019 reporting years indicate that the average of the analytical results for a particular parameter indicates that storm water discharges from the Facility exceed the annual NALs (as set forth in the General Permit) or if two or more analytical results from samples taken for any parameter within the 2017-2018 or 2018-2019 reporting years exceed the instantaneous maximum NAL, AXL agrees to take responsive actions to improve its storm water management practices to address exceedances of the NAL attributable to its industrial sources, including re-evaluating its structural and non-structural BMPs and considering implementing additional BMPs aimed at reducing levels observed in storm water samples.

13.     **Amendment of Storm Water Pollution Prevention Plan ("SWPPP").**

By sixty (60) days after the Effective Date, AXL shall have amended the Facility's SWPPP to incorporate all changes, improvements, sample log forms, and best management practices set forth in paragraph 8 of this Consent Decree. AXL shall ensure that all maps, tables, and text comply with the requirements of the General Permit. AXL shall ensure that the SWPPP describes all structural and non-structural BMPs and details the measures to be installed.

14. **Mitigation Payment.** In recognition of the good faith efforts by AXL to comply with all aspects of the General Permit and the Clean Water Act, and in lieu of payment by AXL of any penalties, which have been disputed but may have been assessed in this action if it had been adjudicated adverse to AXL, the SETTLING PARTIES agree that AXL will pay the sum of $29,500.00 to OCW for the purpose of providing environmentally beneficial projects relating to water quality improvements in the Los Angeles River Reach 2 watershed. Payment shall be mailed to Levitt Law, APC – Client Trust, as follows: 311 Main Street, #8, Seal Beach, CA 90740. Payment shall be made by AXL to OCW within five (5) calendar days of the District Court's entry of the Order dismissing the action described in Paragraph 2 of this Consent Decree. AXL shall copy OCW with any correspondence.

15. **Fees, Costs, and Expenses.** As reimbursement for OCW's investigative, expert and attorneys' fees and costs, AXL shall pay OCW the sum of Twenty Thousand Five Hundred ($20,500.00). Payment shall be made by AXL within five (5) calendar days of the District Court's entry of the Order dismissing the action described in Paragraph 2 of this Consent Decree. Payment by AXL to OCW shall be made in the form of a single check payable to "Levitt Law – Client Trust," and shall constitute full payment for all costs of litigation, including investigative, expert and attorneys' fees and costs incurred by OCW that have or could have been claimed in connection with OCW's claims, up to and including the District Court's entry of the Order.

16. **Review by Federal Agencies.** OCW shall submit this Consent Decree to the U.S. EPA and the U.S. Department of Justice (hereinafter, the "Agencies") within

five (5) days after the lodging of this Consent Decree with this Court for review consistent with 40 C.F.R. § 135.5. The Agencies' review period expires forty-five (45) days after receipt of the Consent Decree by both Agencies, as evidenced by the return receipts and the confirming correspondence of DOJ. In the event that the Agencies comment negatively on the provisions of this Consent Decree, OCW and AXL agree to meet and confer to attempt to resolve the issue(s) raised by the Agencies. If OCW and AXL are unable to resolve any issue(s) raised by the Agencies in their comments, OCW and AXL agree to expeditiously seek a settlement conference with the Magistrate Judge assigned to this matter to resolve the issue(s). If the SETTLING PARTIES cannot resolve the issue(s) through a settlement conference, this Consent Decree shall be null and void. The date of (a) the Agencies' unconditioned approval of this Consent Decree, (b) the expiration of the Agencies' review period, or (c) the SETTLING PARTIES' resolution of all issues raised by the Agencies, whichever is earliest, shall be defined as the "Agency Approval Date."

17. **No Admission or Finding.** This Consent Decree nor any payment pursuant to the Consent Decree nor compliance with this Consent Decree shall constitute evidence or be construed as a finding, adjudication, or acknowledgment of any fact, law or liability, nor shall it be construed as an admission of violation of any law, rule or regulation. However, this Consent Decree may constitute evidence in actions seeking compliance with this Consent Decree. Evidence of the payment amount may be used to enforce the payment provisions of this Consent Decree.

18. **Mutual Release of Liability and Covenant Not to Sue.** In consideration of the above, and except as otherwise provided by this Consent Decree, the SETTLING PARTIES hereby fully release each other and their respective parents, affiliates, subsidiaries, divisions, insurers, successors, assigns, and current and former employees, attorneys, officers, directors, members, shareholders, and agents from any and all claims and demands of any kind, nature, or description whatsoever, known and unknown, and from any and all liabilities, damages, injuries, actions or causes of action, either at law or

in equity, which it may presently have, or which may later accrue or be acquired by it, arising from the Complaint or Notice Letters, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in the Complaint or Notice Letters, for the alleged failure of Defendant to comply with the Clean Water Act at the Facility, up to and including the Termination Date.

19.    **1542 Acknowledgment.**  The SETTLING PARTIES acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

The SETTLING PARTIES hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the 60-Day Notice Letter and Complaint at the Facility up to and including the Termination Date of this Consent Decree.

20.    **No Further Actions.**  For the period beginning on the Effective Date and ending on the Termination Date, neither OCW, nor its officers, executive staff, members of its Steering Committee or counsel will bring any enforcement action or pursue or take any action with respect to any statutory or common law claim, to the full extent that any of the foregoing were or could have been asserted by OCW against AXL or the RELEASEES (as defined in paragraph 21, below) in the Complaint, the Notice, or covered by this AGREEMENT, except as provided for in this AGREEMENT, nor will they file or support other lawsuits, by contacting, providing financial assistance or personnel time or taking any other affirmative actions, against or relating to the Facility by other groups or individuals who would rely upon the citizen suit provision of the

Clean Water Act or any other statutory or common law claim, to challenge the Facility's compliance with the Clean Water Act, or the General Permit.

21. **Releases.** This AGREEMENT is a final and binding resolution between Plaintiff, on his own behalf, and on behalf of the public and in the public interest, and AXL, and each of their respective parents, affiliates, subsidiaries, divisions, insurers, successors, assigns, and current and former employees, attorneys, officers, directors, members, shareholders, and agents ("RELEASEES") regarding the matters addressed in this AGREEMENT and shall have preclusive effect such that no other person or entity, whether purporting to act in his, her or its interests or the public interest shall be permitted to pursue and/or take action with respect to any violation of the CWA that was alleged in the Complaint, that could have been brought pursuant to the Notice or that is addressed by this AGREEMENT.

22. **Dispute Resolution Procedures.** Except as specifically noted herein, any disputes with respect to any of the provisions of this Consent Decree shall be resolved through the following procedure. The SETTLING PARTIES agree to first meet and confer in good faith to resolve any dispute arising under this Consent Decree. In the event that such disputes cannot be resolved through this meet and confer process, the SETTLING PARTIES agree to request a settlement meeting before the Magistrate Judge assigned to this action. In the event that the SETTLING PARTIES cannot resolve the dispute by the conclusion of the settlement meeting with the Magistrate Judge, the SETTLING PARTIES agree to submit the dispute via motion to the District Court.

## GENERAL PROVISIONS

23. **Force Majeure.** AXL will notify OCW if timely implementation of AXL's respective duties under this Consent Decree becomes impossible due to circumstances beyond the control of AXL or its agents, and which could not have been reasonably foreseen and prevented by the AXL's exercise of due diligence. Any delays due to AXL's respective failure to make timely and bona fide applications and to exercise diligent efforts to comply with the terms in this Consent Decree will not, in any event, be

considered to be circumstances beyond the AXL's control.

(a) If AXL claims impossibility, it will notify OCW in writing within twenty (20) business days of the date that AXL discovers the event or circumstance that caused or would cause non-performance with the terms of this Consent Decree. The notice must describe the reason for the non-performance and specifically refer to this section of this Consent Decree. The notice must describe the anticipated length of time the non-performance may persist, the cause or causes of the non-performance, the measures taken or to be taken by AXL to prevent or minimize the non-performance, the schedule by which the measures will be implemented, and the anticipated date of compliance. AXL will adopt all reasonable measures to avoid and minimize such non-performance.

(b) The SETTLING PARTIES will meet and confer in good faith concerning the non-performance and, if the SETTLING PARTIES concur that performance was or is impossible, despite the timely good faith efforts of AXL, due to circumstances beyond the control of AXL that could not have been reasonably foreseen and prevented by the exercise of due diligence by AXL, new performance deadlines will be established.

(c) If OCW disagrees with AXL's notice, or in the event that the SETTLING PARTIES cannot timely agree on the terms of new performance deadlines or requirements, either SETTLING PARTY may invoke the dispute resolution process described in Paragraph 22 of this Consent Decree. In such proceeding, AXL will bear the burden of proving that any delay in performance of any requirement of this Consent Decree was caused or will be caused by force majeure and the extent of any delay attributable to such circumstances.

24. **Construction.** The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined by law, in the General Permit, and the Clean Water Act or specifically herein.

25. **Choice of Law.** This Consent Decree shall be governed by the laws of the

United States, and where applicable, the laws of the State of California.

26.   **Severability.**  In the event that any provision, section, or sentence of this Consent Decree is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

27.   **Correspondence.**  All notices required herein or any other correspondence pertaining to this Consent Decree shall be sent by regular, certified, overnight mail, or e-mail as follows:

| If to OCW: | Copy to: |
|---|---|
| | Scott L. Levitt, Esq. |
| | LEVITT LAW, APC |
| | 311 Main Street, Suite #8 |
| | Seal Beach, CA 90740 |
| | (562) 493-7548 |
| | |
| If to AXL: | Copy to: |
| James Newton | Charles H. Pomeroy |
| | cpomeroy@stilespomeroy.com |
| | StilesPomeroy LLP |
| 5216 Pacific Blvd. | 790 E. Green Street |
| Huntington Park, CA 90255 | Pasadena, CA 91101 |
| | (626) 243-5599 |

Notifications of communications shall be deemed submitted on the date that they are e-mailed, postmarked and sent by first-class mail or deposited with an overnight mail/delivery service.  Any change of address or addresses shall be communicated in the manner described above for giving notices.

28.   **Counterparts.**  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document. Telecopied, scanned (.pdf), and/or facsimiled copies of original signature shall be deemed to be originally executed counterparts of this Consent Decree.

29.   **Assignment.**  Subject only to the express restrictions contained in this Consent Decree, all of the rights, duties and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon the SETTLING PARTIES, and their

successors and assigns.

30. **Modification of the Agreement.** This Consent Decree, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the SETTLING PARTIES.

31. **Full Settlement.** This Consent Decree constitutes a full and final settlement of this matter. It is expressly understood and agreed that the Consent Decree has been freely and voluntarily entered into by the SETTLING PARTIES with and upon advice of counsel.

32. **Integration Clause.** This is an integrated Consent Decree. This Consent Decree is intended to be a full and complete statement of the terms of the agreement between the SETTLING PARTIES and expressly supersedes any and all prior oral or written agreements covenants, representations and warranties (express or implied) concerning the subject matter of this Consent Decree.

33. **Authority.** The undersigned representatives for OCW and AXL each certify that he/she is fully authorized by the party whom he/she represents to enter into the terms and conditions of this Consent Decree.

37. **Continuing Jurisdiction**. This Court shall retain jurisdiction to enforce the terms of the Consent Decree.

**IT IS SO ORDERED.**

DATED: December 8. 2017

DOLLY M. GEE
UNITED STATES DISTRICT JUDGE

# METAL FINISHING ASSOCIATION OF SOUTHERN CALIFORNIA
## COMPLIANCE GROUP
## SITE MAP
### Page 1 of 2

| BUSINESS NAME | | | |
|---|---|---|---|
| Aircraft X-Ray Laboratories, Inc. | | | |
| SITE ADDRESS 5216 Pacific Blvd. | | CITY Huntington Park | ZIP CODE 90255 |
| DATE MAP DRAWN 10/20/2017 | MAP # 1 | FACILITY WDID # 4 19I016489 | |



Site Map Locator Page 2

E. 52nd Street

Bldg 1
Bldg 2
Bldg 3
Bldg 4
Bldg 5

City Owned Alleyway

Parking Lot

City Owned Alleyway

Wastewater Treatment

Bldg 6

Pacific Blvd.

E. 53rd Street

North

Scale: 1" = 50 ft

Landscaped Areas

MCT  Form SM 5/1/15 Rev.

**BUSINESS NAME:**   Aircraft X-Ray Laboratories, Inc.

| SITE MAP INFORMATION | N/A | MAP ID |
|---|:---:|:---:|
| FACILITIES BOUNDARIES | | 1 |
| DRAINAGE AREAS | | 2 |
| DIRECTION OF STORM WATER FLOW | | 3 |
| AREAS IMPACTED BY DISCHARGES FROM SURROUNDING AREAS | ✓ | 4 |
| ON-SITE WATER BODIES | ✓ | 5 |
| AREAS OF SOIL EROSION | ✓ | 6 |
| NEARBY WATER BODIES | ✓ | 7 |
| MUNICIPAL STORM DRAIN INLETS | | 8 |
| POINTS OF DISCHARGE | | 9 |
| STRUCTURAL CONTROL MEASURES | ✓ | 10 |
| NON-IMPERVIOUS AREAS | ✓ | 11 |
| LOCATIONS WHERE MATERIALS MAY BE DIRECTLY EXPOSED TO PRECIPITATION   (ONLY DURING SHIPPING/RECEIVING) | | 12 |
| SIGNIFICANT SPILLS & LEAKS AREAS | ✓ | 13 |
| MATERIAL STORAGE AREAS / TANKS | | 14 |
| SHIPPING  & RECEIVING AREAS | | 15 |
| FUELING AREAS | ✓ | 16 |
| VEHICLE & EQUIPMENT STORAGE/MAINTENANCE AREAS | | 17 |
| MATERIAL HANDLING AND PROCESSING AREAS | | 18 |
| AREAS OF INDUSTRIAL ACTIVITY DIRECTLY EXPOSED TO PRECIPITATION | ✓ | 19 |
| WASTE TREATMENT AND DISPOSAL AREAS | | 20 |
| DUST/PARTICULATE GENERATION AREAS | | 21 |
| AUTHORIZED NON-STORM WATER DISCHARGES | ✓ | 22 |
| NON-AUTHORIZED NON-STORM WATER DISCHARGES | ✓ | 23 |
| OTHER AREAS OF INDUSTRIAL ACTIVITIES | ✓ | 24 |
| STORMWATER DISCHARGE COLLECTION POINT | | 25 |
| HOUSEKEEPING AREAS | | 26 |
| | | |

**EXHIBIT "A"**



July 24, 2017

| | |
|---|---|
| Aircraft X-Ray Laboratories, Inc.<br>James Newton<br>5216 Pacific Blvd<br>Huntington Park, CA, 90255 | Aircraft X-Ray Laboratories, Inc.<br>Ruben Jimenez<br>Maintenance Supervisor<br>5216 Pacific Blvd<br>Huntington Park, CA, 90255 |
| Aircraft X-Ray Laboratories, Inc.<br>Justin Guzman<br>Facilities Manager<br>5216 Pacific Blvd<br>Huntington Park, CA, 90255 | Thomas Howard<br>Executive Director<br>State Water Resources Control Board<br>1001 I Street<br>Sacramento, CA 95814 |
| U.S. Environmental Protection Agency<br>Gina McCarthy, Administrator<br>Mail Code: 1101 A<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | Samuel Unger, Executive Officer<br>Regional Water Quality Control Board<br>Los Angeles Region<br>320 West Fourth St., Ste. 200<br>Los Angeles, CA 90013 |
| Ms. Alexis Strauss<br>Regional Administrator<br>U.S. EPA, Region 9<br>75 Hawthorne Street<br>San Francisco, CA 94105 | Mr. Jeff Sessions<br>U.S. Attorney General<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, DC 20530-001 |
| | |

**Notice of Violations and Intent to File Suit under the Clean Water Act**

To Whom It May Concern:

Levitt Law, APC ("Levitt Law") represents Our Clean Waters ("OCW"), a non-profit corporation organized under the laws of the State of California. This letter is to give notice that Levitt Law, on behalf of OCW, intends to file a civil action against Aircraft X-Ray Laboratories, Inc. ("Aircraft X-Ray") for violations of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA") at Aircraft X-Ray's Facility located at 5216 Pacific Blvd., Huntington Park, CA, 90255 (the "Facility").

OCW is concerned with the environmental health of the Los Angeles River Reach 2, on behalf of the public that uses and enjoys said Water Bodies, its inflows, outflows, and other waters of the

affected Watershed; specifically, the Los Angeles River reach 1, Lower Los Angeles River, and the Los Angeles River Estuary. The public's use and enjoyment of these waters is negatively affected by the pollution caused by Aircraft X-Ray's operations. Additionally, OCW acts in the interest of the general public to prevent pollution in these waterways, for the benefit of their ecosystems, and for the benefits of all individuals and communities who use these waterways for various recreational, educational, and spiritual purposes.

This letter addresses Aircraft X-Ray's unlawful discharge of pollutants from the Facility into conveyance channels that discharge into the Los Angeles River reach 2. The facility is discharging storm water pursuant to National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board ("State Board") Order No. 97-03-DWQ ("1997 Permit") as renewed by Order No. 2015-0057-DWQ ("2015 Permit").[1] The 1997 Permit was in effect between 1997 and June 30, 2015, and the 2015 Permit went into effect on July 1, 2015. As appropriate, OCW refers to the 1997 and 2015 Permits in this letter collectively as the "General Permit." Investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Permit.

Section 505(b) of the Clean Water Act requires a citizen to give notice of intent to file suit sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(b)). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the State in which the violations occur.

As required by the Clean Water Act Section 505(b), this Notice of Violations and Intent to File Suit provides notice to Aircraft X-Ray of the violations that have occurred and which continue to occur at the Facility. Consequently, OCW hereby places Aircraft X-Ray on formal notice, that after the expiration of sixty (60) days from the date of this Notice of Violations and the Intent to Sue, OCW intends to file suit in federal court against Aircraft X-Ray under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the CWA and the General Permit. The violations are described more fully below.

During the 60-day notice period, OCW is willing to discuss effective remedies for the violations noticed in this letter. We suggest that Aircraft X-Ray contact OCW's attorneys at Levitt Law within the next twenty (20) days so these discussions may be completed by the conclusion of the 60-day notice period. Please note that we do not intend to delay the filing of a complaint in federal court, and service of the complaint shortly thereafter, even if discussions are continuing when the notice period ends.

# I. THE LOCATION OF THE ALLEGED VIOLATIONS

## A. The Facility

The Aircraft X-Ray Laboratories ("Aircraft X-Ray") Facility is located at 5216 Pacific Blvd., Huntington Park, CA, 90255. The site comprises approximately 2 acres of land, approximately 1.24 miles from the Los Angeles River. Aircraft X-Ray operates as a metal finishing company that also performs non-destructive testing and painting of aerospace parts and components, and certifies that the Facility is classified under Standard Industrial Classification ("SIC") codes 3471

---

[1] On April 1, 2014, the State Water Resources Control Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No. 2014-57-DWQ, which has taken force or effect on its effective date of July 1, 2015. As of the effective date, Water Quality Order No. 2014-57-DWQ has superseded and rescinded the prior Industrial General Permit except for purposes of enforcement actions brought pursuant to the prior permit.

(Electroplating, Plating, Polishing, Anodizing, and Coloring) and 3479 (Coating, Engraving, and Allied Services, Not Elsewhere Classified). Aircraft X-Ray conducts the following industrial activities at the Facility: abrasive stripping; anodizing; etching; cleaning; painting; passivation; waste water treatment; material storage and handling; waste handling and storage; loading and unloading; maintenance; and dust and particulate generation. At a minimum, Aircraft X-Ray utilizes the following industrial materials at the Facility: metals, acids, caustics, solvents, paints, oils, abrasive media, titanium etch, tri-acid etch, deoxidizers, chromic acid anodize, Aluminux 1000, soap, and filter cake. Possible pollutants from the Facility include: pH, Total Suspended Solids ("TSS"), Oil and Grease ("O&G"), Zinc ("Zn"), Aluminum ("Al"), Iron ("Fe"), Nitrate + Nitrite ("N+N"), Chromium ("Cr"), and other pollutants. Storm water from the Facility discharges via the local storm sewer system, and/or surface runoff indirectly into the Los Angeles River Reach 2.

**B. The Affected Water**

The Los Angeles River Reach 2, and the overall affected Watershed are waters of the United States. The CWA requires that water bodies such as the Los Angeles River Reach 2 and its inflows and outflows meet water quality objectives that protect specific "beneficial uses." The beneficial uses of the Los Angeles River Reach 2 include municipal and domestic supply, industrial service supply, ground water recharge, warm freshwater habitat, wildlife habitat, and water contact and non-contact recreation. Contaminated storm water from the Facility adversely affects the water quality of the Los Angeles River Reach 2, and the overall Affected Watershed, and threatens the beneficial uses and ecosystems of these waters.

## II. THE FACILITY'S VIOLATIONS OF THE CLEAN WATER ACT

Under the Clean Water Act, the discharge of any pollutant to a water of the United States is unlawful except in compliance with certain provisions of the Clean Water Act. (See 33 U.S.C. § 1311(a)). Further, it is unlawful to discharge in violation of the terms and conditions of an NPDES permit, CWA § 301(a), 33 U.S.C. § 1311(a); *see also* CWA § 402(p), 33 U.S.C. § 1342(p) (requiring NPDES permit issuance for the discharge of storm water associated with industrial activities). In California, any person who discharges storm water associated with industrial activity must comply with the terms of the Industrial General Permit in order to lawfully discharge.

Aircraft X-Ray has submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the Industrial General Permit since at least 2001 (WDID Number 4 19I016489). However, information available to OCW indicates that storm water discharges from the Facility have violated the terms of the Industrial General Permit, and have been violating, and continue to violate, the CWA.

Pursuant to Section I.A.8 of the Industrial General Permit, a facility operator must comply with all conditions of the Industrial General Permit. (Industrial General Permit, §I.A.8. [dischargers must "comply with all requirements, provisions, limitations, and prohibitions in this General Permit."]). Failure to comply with the Industrial General Permit is a Clean Water Act violation. (Industrial General Permit §XXI.A.). Any non-compliance further exposes an owner/operator to an (a) enforcement action; (b) Industrial General Permit termination, revocation and re-issuance, or modification; or (c) denial of an Industrial General Permit renewal application. As an enrollee, Aircraft X-Ray has a duty to comply with the Industrial General Permit and is subject to all of the provisions therein.

## A. Discharges in Excess of BAT/BCT Levels

The Effluent Limitations of the Industrial General Permit prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants[2] and best conventional pollutant control technology ("BCT") for conventional pollutants. Industrial General Permit § I(D)(32), II(D)(2); Previous Industrial General Permit, Order Part B(3). Specifically, the Permit "requires control of pollutant discharges using BAT and BCT to reduce and prevent discharges of pollutants, and any more stringent effluent limitations necessary for receiving waters to meet applicable water quality standards." (Industrial General Permit §I(D)(32); see also §V.A.). BAT and BCT include both nonstructural and structural measures. 1997 Permit, Section A(8); 2015 Permit Section X(H). Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand, and fecal coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. *Id.*; 40 C.F.R. § 401.15.

The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmark levels are reflected as Numeric Action Level (NAL) values in the current Industrial General Permit (also known as Benchmark values in the Previous Industrial General Permit). These levels are set at the maximum pollutant concentration present to determine if an industrial Facility is employing BAT and BCT. (See Attachment 1 of this Notice for applicable Benchmark Values).[3]

Additionally, the Previous Industrial General Permit notes that effluent limitation guidelines for several named industrial categories have been established and codified by the Federal Government. See Previous Industrial General Permit § VIII. The Previous Industrial General Permit mandates that for facilities that fall within such industrial categories, compliance with the listed BAT and BCT for the specified pollutants listed therein must be met in order to be in compliance with the Previous Industrial General Permit. *Id.* Aircraft X-Ray falls within these named industrial categories and it must have complied with the effluent limitations found therein in order to have been in compliance with the previous Industrial General Permit during its effective period.

Based on Aircraft X-Ray's self-reporting data and/or lack thereof, Aircraft X-Ray's self-reporting of industrial storm water discharges shows a pattern of exceedances of Benchmarks and NAL values, especially as it pertains to the parameters Zn and N+N. These exceedances are extremely significant due to the Los Angeles River Reach 2 and its associated watershed being impaired for, and especially sensitive to, these pollutants. This pattern of exceedances of Benchmarks and NAL values indicate that Aircraft X-Ray has failed and is failing to employ measures that constitute BAT and BCT in violation of the requirements of the Industrial General Permit and Previous Industrial General Permit. Self monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

OCW alleges and notifies Aircraft X-Ray that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark Values for Zn and N+N. Aircraft X-Ray's ongoing discharges of storm water containing levels

---

[2] *BAT is defined at 40 C.F.R. § 437.1 et seq. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others.*

[3] *The Benchmark values are part of the EPA's Multi-Sector General Permit ("MSGP"). See 73 Fed. Reg 56,572 (Sept 29, 2008) (Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharged From Industrial Activities).*

of pollutants above EPA Benchmark values, and BAT and BCT based levels of control, also demonstrate that Aircraft X-Ray has not developed and implemented sufficient Best Management Practices ("BMPs") at the Facility. Proper BMPs could include, but are not limited to, moving certain pollution-generating activities under cover or indoors, capturing and effectively filtering or otherwise treating all storm water prior to discharge, frequent sweeping to reduce build-up of pollutants on-site, installing filters on downspouts and storm drains, and other similar measures.

Aircraft X-Ray's failure to develop and/or implement adequate pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each and every day Aircraft X-Ray discharges without meeting BAT/BCT. OCW alleges that Aircraft X-Ray has discharged storm water containing excessive levels of pollutants from the Facility to the Los Angeles River Reach 2 during significant local rain events over 0.1 inches in the last five (5) years (Attachment 2). [4] Every significant rain event that has occurred in the last five (5) years represents a discharge of polluted storm water run-off into the Los Angeles River Reach 2. Aircraft X-Ray is subject to civil penalties for each violation of the Industrial General Permit and the CWA within the past five (5) years.

## B. Discharges Impairing Receiving Waters

The CWA and Industrial General Permit's Discharge Prohibitions disallow storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. See Industrial General Permit, Section III; Previous Industrial General Permit Order, Part A (2). The Industrial General Permit also prohibits storm water discharges to surface or groundwater that adversely impact human health or the environment. See Industrial General Permit, Section VI (b-c); Previous Industrial General Permit Order, Part C (1). Receiving Water Limitations of the Industrial General Permit prohibit storm water discharges that cause or contribute to an exceedance of applicable Water Quality Standards ("WQS") contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan. See Industrial General Permit, Section VI (a); Previous Industrial General Permit Order, Part C (2). Applicable WQS are set forth in the California Toxic Rule ("CTR")[5] and Water Quality Control Plan – Los Angeles Region (Region 4): Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties (the "Basin Plan").[6] Exceedances of WQS are violations of the Industrial General Permit, the CTR, and the Basin Plan.

The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31, 682 (May 18, 2000). See http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/basin_pla n_documentation.shtml to reference the Region 4 Basin Plan. The beneficial uses of the Los Angeles River Reach 2 and its tributaries include municipal and domestic supply, industrial service supply, ground water recharge, warm freshwater habitat, wildlife habitat, and water contact and non-contact recreation. The non-contact water recreation use is defined as "uses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible. These uses include, but are not limited to, picknicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life

---

[4] *The Benchmark values are part of the EPAs Multi-Sector General Permit ("MSGP"). See 73 Fed. Reg. 56,572 (Sept. 29, 2008) (Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities).*

[5] *The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31, 682 (May 18, 2000).*

[6] *The Basin Plan is published by the Los Angeles Regional Water Quality Control Board and can be accessed at http://www.waterboards.ca.gov*

study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." *Id.* at 3-3. Contact recreation use includes fishing and wading. *Id.*

The Basin Plan establishes WQS for all Inland Surface Waters, including the Affected Water Body Watershed, which contain, but are not limited, to the following standards:

- A narrative toxicity standard which states that "all waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life." *Id.* at 3-38.

- A narrative oil and grease standard which states that "waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." Id. at 3-29.

- That "waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3-37.

- That "the pH of inland surface waters shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges." *Id.* at 3-35.

- That "surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect designated beneficial use." *Id.* at 3-24.

- That "waters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses." *Id.* at 3-26.

- That "waters shall be free of coloration that causes nuisance or adversely affects beneficial uses." *Id.* at 3-25.

- That "waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses." *Id.* at 3-38.

- That "waters shall not contain taste or odor-producing substances in concentrations that impart undesirable tastes or odors to fish flesh or other edible aquatic resources, cause nuisance, or adversely affect beneficial uses." *Id.* at 3-37.

Additionally, the EPA has adopted freshwater numeric quality standards for Zinc of 0.120 mg/L (Criteria Maximum Concentration – "CMC"). 65 Fed. Reg. 31712 (May 18, 2000) (California Toxics Rule). ·

OCW alleges that Aircraft X-Ray's storm water discharges have caused or contributed to exceedances of Receiving Water Limitations in the Industrial General Permit and the WQS set forth in the Basin Plan and CTR, and is clearly in violation of the CWA. These allegations are based on Aircraft X-Ray's self-reported data submitted to the Los Angeles Regional Water Quality Control Board. The sampling results indicate that Aircraft X-Ray's discharges are causing or threatening to cause pollution, contamination, and/or nuisance; adversely impacting human health or the environment; and violating applicable WQS (See Attachment 1). Aircraft X-

Ray's data exhibits numerous exceedances of Zn, N+N, and pH; all of which the Los Angeles River Reach 2 and the overall affected Watershed are impaired for.

OCW alleges that each day that Aircraft X-Ray has discharged storm water from the Facility, Aircraft X-Ray's storm water has contained levels of pollutants that exceeded one or more of the Receiving Water Limitations and/or applicable WQS in the Los Angeles River Reach 2 and the Affected Watershed. OCW alleges that Aircraft X-Ray has discharged storm water exceeding Receiving Water Limitations and/or WQS from the Facility to the Los Angeles River Reach 2 and the Affected Watershed during significant local rain events over 0.1 inches in the last five (5) years (See Attachment 2). Each discharge from the Facility that violates a Receiving Water Limitation or has caused or contributed, or causes or contributes, to an exceedance of an applicable WQS constitutes a separate violation of the Industrial General Permit and the CWA. Aircraft X-Ray is subject to penalties for each violation of the Industrial General Permit and the CWA within the past five (5) years.

**C. Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan**
The Industrial General Permit requires dischargers to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP"). See Industrial General Permit, Section X (B); Previous Industrial General Permit, Part A (I) (a) and Provision E (2). The Industrial General Permit also requires dischargers to make all necessary revisions to the existing SWPPP promptly. See Industrial General Permit, Section X (B); Previous Industrial General Permit Order, Part E (2).

The SWPPP must include, among other requirements, the following: a site map, a list of significant materials handled and stored at the site, a description and assessment of all Aircraft X-Ray pollutant sources, a description of the BMPs that will reduce or prevent pollutants in storm water discharges, specification of BMPs designed to reduce pollutant discharge to BAT and BCT levels, a comprehensive site compliance evaluation completed each reporting year, and revisions to the SWPPP within 90 days after a Facility manager determines that the SWPPP is in violation of any requirements of the Industrial General Permit. See Industrial General Permit, Section X (A); Previous Industrial General Permit, Part A.

Based on information available to OCW, Aircraft X-Ray has failed to prepare and/or implement an adequate SWPPP and/or failed to revise the SWPPP to satisfy each of the requirements stated in Section X (A) of the Industrial General Permit and/or the corresponding Section of the Previous Industrial General Permit. For Example, Aircraft X-Ray's SWPPP does not include and/or Aircraft X-Ray has not implemented adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels in accordance with Section A (8) of the Industrial General Permit as evidenced by the data in Attachment 1. The Facility's storm water samples have consistently exceeded EPA Benchmarks and NALs, demonstrating the failure of its BMPs to reduce or prevent pollutants associated with industrial activities in the Facility's discharges. Despite these exceedances, Aircraft X-Ray has failed to sufficiently update and revise the Facility's SWPPP. The facility's SWPPP has therefore never achieved the Industrial General Permit's objective to identify and implement proper BMPs to reduce or prevent pollutants associated with industrial activities in storm water discharges.

Additionally, the SWPPP states there are materials stored outdoors in the southwest area of Building 6. These materials are exposed and may be contributing pollutants to the facility's

discharge. The SWPPP does not adequately explain or justify why there is not sampling performed at this drainage area.

Accordingly, Aircraft X-Ray has violated the CWA each and every day that it has failed to develop and/or implement an adequate SWPPP meeting all of the requirements of Section X (A) of the Industrial General Permit and/or the corresponding Section of the Previous Industrial General Permit, and Aircraft X-Ray will continue to be in violation every day until it develops and implements an adequate SWPPP. Aircraft X-Ray is subject to penalties for each violation of the Industrial General Permit and the CWA occurring within the past five (5) years.

## D. Failure to Develop and Implement an Adequate Monitoring and Reporting Program and to Perform Annual Comprehensive Site Compliance Evaluations

The Industrial Storm Water Permit requires Facility operators to develop and implement a Monitoring Implementation Program ("MIP"). See Industrial General Permit, Section XI; Previous Industrial General Permit, Section B (I) and Order, Part E (3). The Industrial General Permit requires that the MIP ensures that the Facility adequately detects and measures its storm water discharges to ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial General Permit. *Id.* Facility operators must ensure that their MIP practices reduce or prevent pollutants in storm water and authorized non-storm water discharges as well as evaluate and revise their practices to meet changing conditions at the Facility. *Id.* This may include revising the SWPPP as required by Section X (A) of the Industrial General Permit and/or the corresponding Section of the Previous Industrial General Permit.

The MIP must measure the effectiveness of BMPs used to prevent or reduce pollutants in storm water and authorized non-storm water discharges, and Facility operators must revise the MIP whenever appropriate. See Industrial General Permit, Section XI; Previous Industrial General Permit, Section B. The Industrial General Permit requires Facility operators to visually observe and collect samples of storm water discharges from all drainage areas. *Id.* Facility operators are also required to provide an explanation of monitoring methods describing how the Facility's monitoring program will satisfy these objectives. *Id.*

The Previous Industrial General Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at the facility (1997 Industrial General Permit, § B(5). The current Industrial General Permit now mandates that facility operators sample four (rather than two) storm water discharges from all drainage locations over the course of the reporting year (2015 Industrial General Permit, §§ XI(B)(2), (3). Although Aircraft X-Ray is part of a compliance group, which reduces the frequency of sampling required by the Facility; submitted Annual Reports indicate there was only one (1) sample performed between 2011-2012, 2012-2013, 2013-2014, 2014-2015; and only (1) one sample collected during the 2015-2016 reporting year. Aircraft X-Ray has failed to adequately explain why there is a lack of required sampling data.

Also, as previously described, Aircraft X-Ray has exposed materials in the southwest area of Building 6 and is not sampling from this drainage area. This directly affected Aircraft X-Ray's requirement to adequately detect and measure its storm water discharges to ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified

in the Industrial General Permit; and to adequately measure the effectiveness of BMPs in place at the Facility.

Aircraft X-Ray has been operating the Facility with an inadequately developed and/or inadequately implemented MIP, in violation of the substantive and procedural requirements set forth in Section B of the Industrial General Permit. For example, the data in Attachment 1 indicates that Aircraft X-Ray's monitoring program has not ensured that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial General Permit as required by the Industrial General Permit, Section XI and/or the Previous Industrial General Permit, Section B. The monitoring has not resulted in practices at the Facility that adequately reduce or prevent pollutants in storm water as required by the Industrial General Permit, Section XI and/or the Previous Industrial General Permit, Section B. Similarly, the data in Attachment 1 indicates that Aircraft X-Ray's monitoring program has not effectively identified or responded to compliance problems at the Facility or resulted in effective revision of the BMPs in use or the Facility's SWPPP to address such ongoing problems as required by Industrial General Permit, Section XI and/or the Previous Industrial General Permit, Section B.

As a result of Aircraft X-Ray's failure to adequately develop and/or implement an adequate MIP at the Facility, Aircraft X-Ray has been in daily and continuous violation of the Industrial Storm Water Permit and the CWA each and every day for the past five (5) years. These violations are ongoing. Aircraft X-Ray will continue to be in violation of the monitoring and reporting requirement each day that Aircraft X-Ray fails to adequately develop and/or implement an effective MIP at the Facility. Aircraft X-Ray is subject to penalties for each violation of the Industrial General Permit and the CWA occurring for the last five (5) years.

Aircraft X-Ray owners and/or operators had numerous opportunities to implement a monitoring program to effectively improve its storm water discharges and ensure compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the Industrial General Permit; but failed to do so as required. They are thus subject to penalties in accordance with the Industrial General Permit – punishable by a minimum of $51,570 per day of violation occurring after November 2, 2015 and $37,500 per day of violation occurring before November 2, 2015. (33 U.S.C. §1319(d); 40 CFR 19.4; Industrial General Permit, §XXI.Q.1).

Additionally, the 1997 Permit requires that the Annual Report include an Annual Comprehensive Site Compliance Evaluation ("ACSCE Report"). 1997 Permit, Section B(14). As part of the ACSCE Report, the facility operator must review and evaluate all of the BMPs to determine whether they are adequate or whether SWPPP revisions are needed. The Annual Report must be signed and certified by a duly authorized representative, under penalty of law that the information submitted is true, accurate, and complete to the best of his or her knowledge. The 2015 Permit now requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. See 2015 Permit, § XV.

Information available to OCW indicates Aircraft X-Ray has consistently failed to comply with Section B(14) of the 1997 Permit, and Section XV of the 2015 Permit. None of the facility's ACSCE Reports provide a sufficient explanation of the Facility's failure to take steps to reduce or prevent high levels of pollutants observed in the Facility's storm water discharges. See 1997

Permit Receiving Water Limitation C(3) and C(4) (requiring facility operators to submit a report to the Regional Board describing current and additional BMPs necessary to prevent or reduce pollutants causing or contributing to an exceedance of water quality standards); see also 2015 Permit § X(B)(1)(b). The failure to assess the Facility's BMPs and respond to inadequacies in the ACSCE Reports negates a key component of the evaluation process required in self-monitoring programs such as the General Permit. Instead, Aircraft X-Ray has not proposed sufficient BMPs that properly respond to EPA benchmark and water quality standard exceedances in violation of the General Permit.

OCW puts Aircraft X-Ray on notice that its failures to submit accurate and complete ACSCE Reports are violations of the General Permit and CWA. Aircraft X-Ray is in ongoing violation of the General Permit every day that the Facility operates without evaluating the effectiveness of BMPs and the need for additional BMPs. Each of these violations is a separate and distinct violation of the General Permit and the CWA. Aircraft X-Ray is subject to civil penalties for all violations of the CWA occurring over the past 5 years.

### E. Unpermitted Discharges

Section 301(a) of the CWA prohibits the discharge of any pollutant into waters of the United States unless the discharge is authorized by an NPDES Permit issued pursuant to Section 402 of the CWA. See 33 U.S.C. § 1311 (a), 1342. Aircraft X-Ray sought coverage for the Facility under the Industrial General Permit, which states that any discharge from an industrial Facility not in compliance with the Industrial General Permit must be either eliminated or permitted by a separate NPDES permit. Industrial General Permit, Section III; Previous Industrial General Permit Order, Part A (1). Because Aircraft X-Ray has not obtained coverage under a separate NPDES permit and has failed to eliminate discharges not permitted by the Industrial General Permit, each and every discharge from the Facility described herein, not in compliance with the Industrial General Permit, has constituted and will continue to constitute a discharge without CWA Permit coverage in violation of section 301 (a) of the CWA, 33 U.S.C. § 131 I(a).

## III. PERSON RESPONSIBLE FOR THE VIOLATIONS

Aircraft X-Ray Laboratories, Inc. ("Aircraft X-Ray") is responsible for the violations at the Facility located at 5216 Pacific Blvd., Huntington Park, CA 90255 as described above.

## IV. NAME AND ADDRESS OF NOTICING PARTY

OUR CLEAN WATERS
Laura Meldere, Executive Director
9465 Wilshire Blvd., Suite 300
Beverly Hills, CA 90212
Phone: 424-284-4085
Email: info@ourcleanwaters.com

## V. LEGAL COUNSEL

Levitt Law, APC
Scott L. Levitt, Esq.

scott@levittlawca.com
311 Main Street, Suite #8
Seal Beach, CA 90740
Office: (562) 493-7548
Fax: (562) 493-7562

## VI. REMEDIES

As stated previously, OCW intends, at the close of the 60-day notice period or thereafter, to file suit under CWA section 505(a) against Aircraft X-Ray for the above-referenced violations. OCW will seek declaratory and injunctive relief to prevent further CWA violations pursuant to CWA sections 505(a) and (d), 33 U.S.C.§ 1365(a) and (d), and such other relief as permitted by law. In addition, OCW will seek civil penalties pursuant to CWA section 309(d), 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4, against Aircraft X-Ray in this action. **The CWA imposes civil penalty liability of up to $51,570 per day of violation occurring after November 2, 2015 and $37,500 per day of violation occurring before November 2, 2015, plus attorneys' fees and costs** (33 U.S.C. § 1319(d); 40 C.F.R. § 19.4). OCW will seek to recover such penalties, restitution, attorneys' fees, experts' fees, and costs in accordance with CWA section 505(d), 33 U.S.C. § 1365(d). It should be noted that the statute of limitations is five (5) years for citizen enforcement actions brought pursuant to the federal Clean Water Act, bringing potential liabilities for the last five (5) years. Furthermore, actions are allowable under prior expired permits within the five (5) year period. (See *Illinois v. Outboard Marine, Inc.*, (7th Cir. 1982) 680 F.2d 473, 480-81 [relief granted for violations of an expired Permit]; *Sierra Club v. Aluminum Co. of Am.*, (N.D.N.Y. 1984) 585 F. Supp. 842, 853-854 [holding that the Clean Water Act's legislative intent and public policy favor allowing penalties for violations of an expired permit]).

As noted above, OCW and its Counsel are willing to meet with you during the 60-day notice period to discuss effective remedies for the violations noted in this letter. Please contact me to initiate these discussions.

Sincerely,

Scott L. Levitt, Esq.

**ATTACHMENT 1**

1. Self-Reported Sampling Conducted by Aircraft X-Ray Laboratories, Inc. Demonstrating Non-compliance with BAT/BCT

| Date of Sample | Discharge Point | Parameter | EPA Benchmark Value / NAL Value | Sample Value |
|---|---|---|---|---|
| 5/14/2015 | South End Alley | Zinc | 0.26 mg/L | 0.56 mg/L |
| 3/25/2016 | Storm Water | Zinc | 0.26 mg/L | 0.42 mg/L |
| 3/25/2016 | Storm Water | Iron | 1.0 mg/L | 3.87 mg/L |
| 3/25/2016 | Storm Water | Nitrate + Nitrite as N | 0.68 mg/L | 1.11 mg/L |
| 12/30/2016 | Storm Water #1 | Zinc | 0.26 mg/L | 0.35 mg/L |
| 12/30/2016 | Storm Water #2 | Zinc | 0.26 mg/L | 0.35 mg/L |
| 12/30/2016 | Storm Water #3 | Zinc | 0.26 mg/L | 0.33 mg/L |
| 12/30/2016 | Storm Water #4 | Zinc | 0.26 mg/L | 0.34 mg/L |
| 12/30/2016 | Storm Water #4 | Nitrate + Nitrite as N | 0.68 mg/L | 0.72 mg/L |
| 12/30/2016 | Storm Water #5 | Zinc | 0.26 mg/L | 0.34 mg/L |
| 12/30/2016 | Storm Water #5 | Nitrate + Nitrite as N | 0.68 mg/L | 0.72 mg/L |
| 12/30/2016 | Storm Water #6 | Zinc | 0.26 mg/L | 0.30 mg/L |
| 12/30/2016 | Storm Water #6 | Nitrate + Nitrite as N | 0.68 mg/L | 0.73 mg/L |
| 2/3/2017 | Storm Water #1 | pH | 6.0 - 9.0 s.u. | 5.9 s.u. |
| 2/3/2017 | Storm Water #5 | pH | 6.0 - 9.0 s.u. | 5.9 s.u. |

2. Self-Reported Sampling Conducted by Aircraft X-Ray Laboratories, Inc. demonstrating Non-compliance with Water Quality Standards in the Los Angeles Basin Plan / California Toxics Rule

| Date of Sample | Discharge Point | Parameter | Basin Plan Water Quality Objective / CTR | Sample Value |
|---|---|---|---|---|
| 5/14/2015 | South End Alley | Zinc | 0.120 mg/L (CMC) | 0.56 mg/L |
| 3/25/2016 | Storm Water | Zinc | 0.120 mg/L (CMC) | 0.42 mg/L |
| 12/30/2016 | Storm Water #1 | Zinc | 0.120 mg/L (CMC) | 0.35 mg/L |
| 12/30/2016 | Storm Water #2 | Zinc | 0.120 mg/L (CMC) | 0.35 mg/L |
| 12/30/2016 | Storm Water #3 | Zinc | 0.120 mg/L (CMC) | 0.33 mg/L |
| 12/30/2016 | Storm Water #4 | Zinc | 0.120 mg/L (CMC) | 0.34 mg/L |
| 12/30/2016 | Storm Water #5 | Zinc | 0.120 mg/L (CMC) | 0.34 mg/L |
| 12/30/2016 | Storm Water #6 | Zinc | 0.120 mg/L (CMC) | 0.30 mg/L |
| 2/3/2017 | Storm Water #2 | Zinc | 0.120 mg/L (CMC) | 0.25 mg/L |

| 2/3/2017 | Storm Water #5 | Zinc | 0.120 mg/L (CMC) | 0.22 mg/L |
|----------|----------------|------|-------------------|-----------|
| 2/3/2017 | Storm Water #6 | Zinc | 0.120 mg/L (CMC) | 0.25 mg/L |
| 2/3/2017 | Storm Water #1 | pH | 6.5 - 8.5 s.u. | 5.9 s.u. |
| 2/3/2017 | Storm Water #2 | pH | 6.5 - 8.5 s.u. | 6.0 s.u. |
| 2/3/2017 | Storm Water #5 | pH | 6.5 - 8.5 s.u. | 5.9 s.u. |
| 2/3/2017 | Storm Water #6 | pH | 6.5 - 8.5 s.u. | 6.3 s.u. |

The above referenced discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the 1997 Industrial General Permit; Discharge Prohibitions III(B) and III(C) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Industrial General Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Industrial General Permit.

# ATTACHMENT 2

Rain Dates, Aircraft X-Ray Laboratories, Inc., Huntington Park, CA
Data from KCQT Weather Station - Los Angeles Downtown (Approx. 4 miles from Aircraft X-Ray)
7-21-12 to 7-21-17
Days with Precipitation over 0.1 inch

| | | |
|---|---|---|
| 11/17/2012 | 12/12/2014 | 10/17/2016 |
| 11/29/2012 | 12/16/2014 | 11/20/2016 |
| 11/30/2012 | 12/17/2014 | 11/21/2016 |
| 12/3/2012 | 12/30/2014 | 11/26/2016 |
| 12/18/2012 | 1/10/2015 | 12/15/2016 |
| 12/24/2012 | 1/11/2015 | 12/16/2016 |
| 12/26/2012 | 2/22/2015 | 21/21/2016 |
| 12/29/2012 | 2/28/2015 | 12/22/2016 |
| 1/6/2013 | 3/1/2015 | 12/23/2016 |
| 1/24/2013 | 3/2/2015 | 12/24/2016 |
| 1/25/2013 | 4/7/2015 | 12/30/2016 |
| 2/19/2013 | 5/8/2015 | 1/5/2017 |
| 3/8/2013 | 5/14/2015 | 1/9/2017 |
| 5/6/2013 | 7/8/2015 | 1/11/2017 |
| 11/21/2013 | 9/15/2015 | 1/12/2017 |
| 11/29/2013 | 10/5/2015 | 1/19/2017 |
| 12/19/2013 | 12/13/2015 | 1/20/2017 |
| 2/2/2014 | 12/19/2015 | 1/22/2017 |
| 2/27/2014 | 1/5/2016 | 1/23/2017 |
| 2/28/2014 | 1/6/2015 | 2/3/2017 |
| 3/1/2014 | 1/7/2015 | 2/6/2017 |
| 3/2/2014 | 1/31/2016 | 2/7/2017 |
| 4/1/2014 | 2/17/2016 | 2/10/2017 |
| 10/31/2014 | 2/18/2016 | 2/11/2017 |
| 11/1/2014 | 3/6/2016 | 2/17/2017 |
| 11/30/2014 | 3/7/2016 | 5/7/2017 |
| 12/2/2014 | 3/11/2016 | |
| 12/3/2014 | 4/8/2016 | |